**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| Municipal Association Of South Carolina, | ) ) ) | Civil Action No. 3:08-cv-03072-MJP |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| Service Insurance Company, Inc., | ) ) | |
| Defendant. | ) | |
| Municipal Association of South Carolina | ) ) ) | Civil Action No.: 3:08-CV-3073-MJP |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| USAA General Indemnity Co., | ) ) | |
| Defendant. | ) | |
| Municipal Association of South Carolina | ) ) | Civil Action No.: 3:08-CV-3611-MJP |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| Hartford Fire Insurance Company, Inc., | ) ) ) | |
| Defendant. | ) | |
| Municipal Association of South Carolina | ) ) | Civil Action No.: 3:08-CV-3879-MJP |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| Nationwide Mutual Fire Insurance Company, | ) ) ) | |
| Defendant. | ) | |

---

**ORDER GRANTING PARTIAL SUMMARY JUDGMENT TO PLAINTIFF**
**MUNICIPAL ASSOCIATION OF SOUTH CAROLINA AND DENYING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

**Introduction**

In these consolidated actions, Plaintiff Municipal Association of South Carolina ("MASC") complains that Defendants have failed to pay their municipal business license taxes and penalties assessed for license year 2008.[1]  In their answers, Defendants raise several defenses.  First, Defendants assert that the doctrine of federal preemption is a complete defense to liability for past due business license taxes and assessed penalties. Second, Defendants contend that because they sell flood insurance policies pursuant to the National Flood Insurance Program, a federal flood subsidy program, any municipal business license taxes based upon flood insurance premiums are an impermissible tax by a municipality on the federal government and thus violate principles of sovereign immunity. Third, Defendants contend that the ordinances that provide for the collection of municipal business license taxes do so without providing Defendants with notice and a hearing, and therefore violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment and Article I, Section 5 of the South Carolina Constitution.

The sole issue in this case is whether Defendants, as "Write-Your-Own" ("WYO") companies, are preempted from adhering to the same terms and conditions as other insurance companies doing business in the State of South Carolina including the payment of municipal

---

[1]     MASC seeks the collection of unpaid municipal business license taxes from Defendants Service Insurance Company, Inc. and Hartford Fire Insurance Company for license year 2008.  Because Defendants USAA and Nationwide Mutual paid their municipal business license taxes for license year 2008 to MASC under protest, MASC amended its Complaints against these Defendants seeking a declaration that MASC is entitled to collect municipal business license taxes that are assessed and imposed by municipalities in South Carolina on Defendants in exchange for the privilege of conducting business in this State.

2

business license taxes and, where applicable, assessed penalties for late payment of those taxes.

This Court has jurisdiction over this dispute by virtue of 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy is in excess of Seventy Five Thousand Dollars ($75,000.00) exclusive of interest and costs. Additionally, because this matter involves the National Flood Insurance Program of which this Court has exclusive jurisdiction, subject matter jurisdiction is proper in this Court under 42 U.S.C. § 4701 and 28 U.S.C. § 1331.

This matter is before the Court pursuant to Rule 56 of the South Carolina Rules of Civil Procedure upon motion of MASC for an order granting partial summary judgment and upon motion of Defendants for an order granting summary judgment.[2]  This matter came before me for hearing on November 10, 2010.  Robert E. Tyson, Jr. of Sowell Gray Stepp & Laffitte, L.L.C. and Roy F. Laney of Riley Pope and Laney, L.L.C. appeared on behalf of MASC.  Molly H. Cherry and Bradish J. Waring of Nexsen Pruet, L.L.C. appeared on behalf of Defendants Service Insurance Company, Inc. and Hartford Fire Insurance

---

[2]  In their motion for partial summary judgment, MASC contends that its claims are not preempted by federal law and that the directive issued by the Federal Emergency Management Agency purporting to direct Defendants not to pay assessed municipal business license taxes in no way changes the result reached by this court in a prior, related case, *Municipal Association of South Carolina v. Omaha Property and Casualty Insurance Company*, C.A. No. 3:06-cv-00467-MJP (D.S.C. Apr. 9. 2007). (ECF No. 52, 52-1.) In their motion for summary judgment, Defendants USAA and Nationwide contend that MASC's claims are preempted by federal law and that the assessment and collection of municipal business license taxes violate principles of sovereign immunity. (ECF No. 66.)  In a separately filed motion for summary judgment, Defendants Service and Hartford contend, *inter alia*, that the ordinances allowing for the collection of municipal business license taxes violate Due Process and Equal Protection under the state and federal constitutions. (ECF No. 67.)

Company, Inc.  Robert H. Jordan, John C. von Lehe, Jr., and Merrit Abney of Nelson Mullins Riley & Scarborough, LLP appeared on behalf of Defendants USAA General Indemnity Co.  Barbara M. Bowens of the United States Attorney's Office and Scott Risner of the United States Department of Justice, Civil Division, appeared on behalf of the United States of America. [3]

Thus, having considered the motions and heard arguments from counsel, for the reasons set forth below, the Court grants Plaintiff's Motion for Partial Summary Judgment and denies Defendants' Motions for Summary Judgment.

## Background and Facts

The facts underlying this case are largely undisputed.

### A.      The Parties

MASC is a nonprofit organization existing pursuant to the law of South Carolina whose membership includes virtually all municipalities in the State of South Carolina. MASC administers the Insurance Tax Collection Program ("ITCP") on behalf of certain municipalities ("Participating Municipalities") in South Carolina.     Participating Municipalities in the ITCP adopted ordinances authorizing the collection of business license taxes from insurance companies.  The ordinances of the Participating Municipalities other

---

[3] On August 13, 2010, the United States of America filed a Statement of Interest "to explain why the United States concurs [with Defendants' contention] that the municipal taxes improperly tax federal funds and are otherwise preempted in their entirety."  (ECF No. 77 at 2.)  On September 2, 2010, MASC filed a response to FEMA's Statement of Interest. (ECF No. 89.)

than the City of Greenville established the tax rate at 2% of gross premiums for property and casualty policies.[4]

The Participating Municipalities also executed agreements with MASC authorizing MASC to act as their agent concerning the administration of the ITCP. Section 38-7-160 of the South Carolina Code (Rev. 2002) authorizes municipalities to impose business license taxes on insurance companies collecting gross premiums within the municipal boundaries. Pursuant to municipal ordinances, the municipal business license tax is due on May 31 for the license year. The municipal business license tax is based upon the gross premiums received in the prior calendar year. Pursuant to ordinances adopted by each Participating Municipality, delinquent taxes are subject to a penalty of 5% of the delinquent amount for each month, or a portion of a month for which the taxes remain unpaid.

Defendants write and sell National Flood Insurance policies in South Carolina, as well as other types of policies. The flood insurance sold by Defendants is part of the National Flood Insurance Program ("NFIP"), which was established by Congress in 1968 pursuant to the National Flood Insurance Act, 42 U.S.C. § 4001, *et seq.*

### B.     History of Private Insurer Participation in the National Flood Insurance Program.

Congress passed the National Flood Insurance Act ("NFIA") in 1968. 42 U.S.C. § 4001. The NFIA established the NFIP for the purpose of, "'among other things . . . limit[ing] the damage caused by flood disasters through prevention and protective measures, spread[ing] the risk of flood damage among many private insurers and the federal government, and . . . make[ing] flood insurance 'available on reasonable terms and

---

[4] The tax rate for the City of Greenville is 2.75% of gross premiums.

conditions' to those in need of it.'" *Houck v. State Farm Fire & Cas. Co.*, 194 F. Supp. 2d 452, 455 (D.S.C. 2002) (quoting *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 165 (3d Cir. 1998)).    The NFIA also serves the "most important public purpose [of] encourag[ing] state and local governments to adopt and enforce appropriate land use provisions" in order to restrict development in flood-prone areas.    H.R. Rep. No. 90-1585, at 2966 (1968).    These measures were needed to prevent reliance on federal, state, local, and voluntary disaster relief programs, which were both inadequate to provide full restoration to those in need and costly.    *Id*. at 2966-67.

In order to meet its goal of making affordable flood insurance available to all, the NFIP is federally subsidized and administered by FEMA.    *Houck*, 194 F. Supp. 2d at 454 (citing 42 U.S.C. §§ 4001-4129).    A policy issued under the NFIP is called a Standard Flood Insurance Policy ("SFIP").    The terms of a SFIP are established by "'a regulation of [FEMA], stating the conditions under which federal flood insurance funds may be disbursed to eligible policyholders.'"    *Marseilles Homeowners Condominium Ass'n v. Fid. Nat'l Ins. Co.*, 542 F.3d 1053, 1054 (5th Cir. 2008) (quoting *Mancini v. Redland Ins. Co.*, 248 F.3d 729, 733 (8th Cir. 2001)).    "FEMA sets the terms and conditions of all SFIP's."    *Marseilles*, 542 F.3d at 1054.

The NFIP is designed to use premiums collected to pay flood insurance claims and expenses.    *Studio Frames, Ltd. v. Standard Fire Ins. Co.*, 483 F.3d 239, 243-44 (4th Cir. 2007).    Although the program is not entirely self-sustaining, the vast majority of flood insurance policies are actuarially sound.    *Id.* at 243-44 (stating that Congress only subsidizes about twenty-five percent of flood insurance policies, mostly "older structures").    Only when

6

flood losses are "catastrophic" does the NFIP have to rely on a line of credit with the United States Treasury. *Id.* at 244.

The NFIP was originally a collaborative effort between an association of private insurance companies and the federal government. *See Nat'l Flood Insurers Ass'n v. Harris*, 444 F. Supp. 969, 970-72 (D.C.D.C. 1977) (discussing the original implementation of the NFIP). This pool of companies marketed, issued, and handled claims adjustment of flood insurance policies. *In re: Estate of Lee*, 812 F.2d 253, 255 (5th Cir. 1987). In order to keep the cost low for the policies, the federal government compensated the companies for policies in which the premiums were below actuarial rates and covered flood losses that would exceed the risk covered by the association of insurance companies. *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 388 (9th Cir. 2000). In return for the federal government's support, the insurance pool was subject to heavy federal regulation, including government control over the pool's operating expenses, government access to the pool's financial information, and limits on the companies' maximum profits. *See id.* (discussing government control over expenses and access to financial data); *Lee*, 812 F.2d at 255 (noting the government limits on profits and operating expenses). This agreement was renewed annually in a contract between the government and the insurance company. *Nat'l Flood Insurers*, 444 F. Supp. at 970-71. Disagreement over the terms of this contract led the government to assume full control of the NFIP in 1978 under 42 U.S.C. § 4071, which authorizes the federal government to assume operational authority for the NFIP "in whole *or in part*" either temporarily "or [on] [an]other basis." 42 U.S.C. § 4071(a) (emphasis added); *Lee*, 812 F.2d at 256.

7

The legislative history explains that while 42 U.S.C. § 4071 permits the federal government to establish a "totally Federal program," the government may also use its authority under this section to create merely "a federally financed program using insurance companies, agents, and brokers to sell and service policies."  H.R. Rep. No. 90-1585, at 90 (1968), *as reprinted in* 1968 U.S.C.A.N. 2873, 2972.  The statute itself states that the director of FEMA[5] "shall, to the maximum extent practicable, encourage and arrange for" the participation of private insurance companies in the NFIP.  42 U.S.C. § 4011(c).  After only a few years of being the sole provider of flood insurance policies, the federal government again sought the assistance of private insurance companies.  *Flick*, 205 F.3d at 389.

### C.     The "Write-Your-Own" Program.

In 1983, the Federal Emergency Management Agency ("FEMA") promulgated regulations that enabled the agency to use private insurers, called WYO companies, as intermediaries in providing SFIPs to the public.  *Houck*, 194 F. Supp. 2d at 454 (citing 44 C.F.R. § 61.13(f)) (footnote omitted).  The WYO program allows private insurance companies to issue SFIPs in their own name.  44 C.F.R. §§ 61.13, 62.23.  WYO companies market, issue, and handle claims adjustment of the SFIPs.  *Houck*, 194 F. Supp. 2d at 454 (footnotes omitted).  Although the WYO companies function in some ways as intermediaries between the federal government and the public, the government has made clear that these companies are not general agents of the federal government.  44 CFR § 62.23 ("A WYO

---

[5]  The NFIP was originally the responsibility of the secretary of the Department of Housing and Urban Development (HUD); however, responsibility for administering the NFIP was transferred to FEMA in 1978.  *Flick,* 205 F.3d at 389 (citations omitted).

Company shall act as a fiscal agent of the Federal Government but not as its general agent" and WYO companies "are solely responsible for their obligations to their insureds"). Each Defendant in this case is a WYO company.

The WYO program is administered by FEMA through the Financial Assistance/Subsidy Arrangement ("Arrangement"), a contract between FEMA and the private insurance companies. *See* 44 C.F.R. § 62, App. A; 50 Fed. Reg. 16236 (April 25, 1985). FEMA retains the authority to amend the Arrangement, but does not make amendments without considering comments from the private insurance companies and other participants in the NFIP. *See, e.g.*, 61 Fed. Reg. 37687 (July 19, 1996) (addressing comments raised by two WYO companies concerning the current Arrangement between the federal government and the WYO companies and amending the Arrangement to address many of the companies' concerns); 50 Fed. Reg. 16236 (April 25, 1985) (addressing comments raised by private insurers and regional FEMA offices, among others). Thus, while FEMA is able to effectively regulate the WYO program through its Arrangement with private insurers, the participation and input of the private insurers allows the NFIP to retain "the benefits . . . of a national program of flood insurance [operated] by private sector property insurers." 50 Fed. Reg. 16236 (April 25, 1985).

The testimony in the record before the Court establishes that if an individual is interested in purchasing flood insurance, he or she usually discusses it with an agent of the insurance company. This initial discussion occurs in a private, commercial setting. After the agent takes the insurance application, the agent forwards the application and the premium check to the insurance company or the insurance company's flood insurance administrator.

The company then issues the policy and subsequently services the policy.  If the insured has a claim, the insured contacts his or her agent or the insurance company.  Again, this entire transaction occurs within the private sector—*i.e.*, with the Defendants.  At no point does the insured ever have any contact with FEMA.

In accordance with the Arrangement, the WYO companies remit the premiums collected on flood insurance policies to FEMA.  *Studio Frames*, 483 F.3d at 244; 44 C.F.R. § 62, App. A.  The Court finds that this remittance, however, is made only after the WYO companies "deduct[] a scheduled amount for administrative expenses."  *Studio Frames*, 483 F.3d at 244.  Thus, while "*claims* are . . . paid from federal funds," WYO companies do not remit the entire amount collected on each policy to FEMA and the federal government.  *Id*. (emphasis added).  Instead, WYO companies keep some of this amount as profit.  Additionally, WYO companies are able to keep as profit a portion of the commission received for paying out a claim on a flood insurance policy.[6]  *Scherz v. South Carolina Ins. Co.*, 112 F. Supp. 2d 1000, 1004 (C.D. Cal. 2000).

Although WYO companies are subject to federal regulation by FEMA and to the conditions of the Arrangement, the government intends WYO companies' business practices to mirror those of insurers in other lines of property insurance as closely as possible.  *See* 50 Fed. Reg. 16236 (April 25, 1985).  The government's goal is "to normalize the business of issuing flood insurance polices by WYO Companies along the lines of . . . other lines of

---

[6]  This commission is referred to in the Arrangement as the Unallocated Loss Adjustment Expense ("ULAE").  Although the amended arrangement has removed the ULAE compensation percentage, as of 2009, the commission was still 3.3% of the incurred loss.  74 Fed. Reg. 36611 (July 24, 2009) ("the interim final rule was focused . . . not [on] the actual ULAE rate itself").

property insurance business." 50 Fed. Reg. 16236 (April 25, 1985). Any suggestion that WYO companies be exempt from paying taxes levied against all insurers in the State of South Carolina, therefore, flies in the face of this stated goal.

### D.      The Day-To-Day Operation of a WYO Company.

Hartford Fire Insurance Company's ("Hartford Fire") day-to-day operations are typical of the day-to-day operations of each Defendant.[7]  Hartford Fire is a for-profit insurance company domiciled in Connecticut.  Hartford Fire and its affiliated companies publicly do business as "The Hartford."  While Hartford Fire markets many insurance products, the sale of Hartford Fire flood insurance policies is an important and profitable aspect of its business.  In the year 2008 alone, Hartford Fire made Eight Million Dollars ($8,000,000.00) in profit on its sales of flood insurance.

Hartford Fire sells flood insurance and operates its flood insurance business in a manner similar to other lines of its insurance business.  First, Hartford Fire advertises its flood insurance product to potential customers.  These advertisements specifically identify The Hartford as the insurer.  For example, when describing flood insurance in one of its advertising brochures, The Hartford proclaims, "This valuable protection *is provided by The Hartford*, one of the nation's leading providers of insurance and investments. . . . Call your Independent Agent today about flood insurance *through The Hartford*."  (Emphasis added.)  Further, when describing the role of the federal government regarding flood insurance in its brochure, the Hartford states that The Hartford's coverage is "financially backed by the

---

[7]  The parties do not dispute that Hartford Fire's day-to-day operations with respect to flood insurance is typical of the day to day operations of all Defendants with the sale of flood insurance policies and processing of flood insurance claims.

National Flood Insurance Program." Thus, The Hartford's clear message to potential customers is that the protection is "provided by Hartford", and only "backed" by the government.

Further, because insurance sales are driven by networks of insurance agents, Hartford Fire aggressively works to establish and maintain a robust national sales network of flood insurance agents. Hartford Fire maintains a full-time, national sales manager, and a staff of seven field representatives whose goal is to attract more agents to sell Hartford Fire flood insurance. Hartford Fire aggressively seeks to distinguish its brand in the marketplace from other competitor's flood insurance products. Hartford Fire's flood insurance agents receive competitive commissions on all of their flood insurance sales. Hartford Fire promotes its brand of flood insurance to agents at trade shows so as to attract more agents. Further, Hartford Fire provides agent education and marketing materials to its agents so as to further bolster its flood insurance sales. Through its marketing efforts, Hartford Fire has successfully developed a network of 270 active insurance agents authorized to sell flood insurance in the state of South Carolina.

Like all Defendants, Hartford Fire's flood insurance agents sell flood insurance in a manner similar to many other types of insurance sold by Hartford Fire. After a Hartford Fire agent identifies a potential customer, the Hartford Fire agent completes an "Accord Insurance Application" with the customer. The application identifies The Hartford, but does not identify the federal government. Upon completing the application, the agent accepts a check for payment of the customer's premiums payable to Hartford Fire. After Hartford Fire processes the application, the customer receives an insurance policy naming Hartford Fire

as the insurer which is signed by the President of Hartford Fire.  Hartford Fire further issues a Hartford specific privacy policy to the customer as part of the enrollment process. Hartford Fire provides the customer with applicable endorsements and renewal information. Thus, as far as the consumer is concerned, the policy is issued by The Hartford.

The testimony establishes that if the customer fails to pay Hartford Fire's premium, then Hartford Fire will cancel the policy.  If the customer desires to make a claim regarding the flood insurance policy, the customer contacts the customer's Hartford Fire insurance agent or Hartford Fire's contractor, National Flood Services ("NFS").  Hartford's contractor, NFS, and not the federal government, decides whether a claim is covered or not.  Further, it is The Hartford's obligation to pay any claims to the insured.  In the event Hartford Fire fails to pay a claim, Hartford Fire is the party who is the named party in any subsequent litigation.

Thus, from the advertising and sales process, through policy issuance, administration and claims payment, like all Defendants, Hartford Fire is the only entity which interacts with the customer.  As such, without question Hartford Fire is the entity providing the flood insurance with  the National Flood Insurance Program simply "backing" Hartford Fire's obligations to the customer.

**E.  Flood Insurers Must Be Licensed Under South Carolina State Law.**

Pursuant to the Arrangement between WYO insurers and FEMA, in order for a WYO insurer to issue flood insurance policies in a state, the WYO insurer must be licensed by state law.  44 C.F.R. § 62, App. A, Art. II, §(D)(4).  This requirement exists because "[FEMA], which does not license or regulate insurers, believes . . . flood insurance . . . [should] be

13

issued by licensed insurers," and therefore "[t]hrough the licensure procedures, States can monitor the insurer[]." 50 Fed. Reg. 16236 (April 25, 1985). Under section 38-5-90 of the South Carolina Code (Rev. 2002), all foreign insurance companies doing business in the State of South Carolina must "pay[] all taxes and perform[] all duties required by law." S.C. Code Ann. § 38-5-90(c). This includes those taxes which the State of South Carolina gives municipalities the authority to "levy[] and collect[] . . . in accordance with its ordinances." S.C. Code Ann. 38-7-160; *Municipal Ass'n of South Carolina v. Omaha Property & Cas. Ins. Co.*, C.A. No. 3:06-467-MJP, at *7 (D.S.C. Apr. 9, 2007).

The Participating Municipalities in the instant case adopted ordinances pursuant to Section 38-7-160, levying a business license tax on insurance companies doing business within their municipal boundaries. S.C. Code Ann. § 38-7-160. Revenues from business license taxes are important revenue streams to cities in South Carolina. The income received from municipal business license taxes is used to provide important municipal services, such as increased police protection, fire protection, and infrastructure assistance. Municipalities are required to furnish these services for companies doing business within its boundaries, and these services do not stop to make a distinction as to whether the flood policies collect federal dollars. (*Id.*)

F.    **The 2008 FEMA Memorandum.**

In response to this Court's Order in *Omaha Property*, on May 23, 2008, FEMA issued a memorandum directing WYO companies in South Carolina to ignore this Court's ruling in *Omaha Property*, and further directing the WYO companies "not to pay such taxes in South Carolina or any other jurisdiction where such assessments are made." (FEMA

14

Mem. dated May 23, 2008.)  Notwithstanding FEMA's directive, the evidence establishes that the overwhelming majority of WYO insurance companies continue to properly report and pay municipal business license taxes for flood insurance policies sold in South Carolina.

The 2008 Memorandum states that "the premiums collected as payment for coverage under [flood insurance] policies . . . are Federal dollars and, as such . . . not subject to state and local taxation."  As previously decided by this Court in *Omaha Property*, however, MASC is not seeking to tax federal dollars, nor is it a tax on federal dollars.  *Omaha Property*, C.A. No. 3:06-467-MJP, at *11.

Thus, the sole issue in this case is whether Defendants, as WYO companies, are preempted from adhering to the same terms and conditions as other insurance companies doing business in this State including the payment of municipal business license taxes and assessed penalties.  This Court previously has decided that WYO companies are not preempted and nothing since *Omaha Property* changes that result.

### Legal Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the inferences to be drawn form the underlying facts must be viewed in the light most favorable to the non-moving party.  *Cooper v. United States*, 903 F. Supp. 953, 955 (D.S.C. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Summary judgment serves the useful purpose of disposing of meritless claims before the court and parties become entrenched in frivolous litigation. *Donahue v. Windsor Lacks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). However, summary judgment is considered a "drastic remedy" that should not be granted "unless 'it is perfectly clear that there are no genuine issues of material fact'" in the case. *Taylor v. Huffman*, 36 F.3d 1094, 1094 (4th Cir. 1994) (quoting *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1004-05 (4th Cir. 1987)).

## Discussion

Three years ago in a similar case before this Court, *Municipal Association of South Carolina v. Omaha Property and Casualty Insurance Company*, C.A. No. 3:06-cv-00467-MJP (D.S.C. Apr. 9, 2007), this Court granted MASC's motion for partial summary judgment and denied Omaha Property's motion for summary judgment. The Court ruled in that case that MASC's claims were not preempted by the doctrine of federal preemption, and that a municipal business license tax was not a tax on the federal government. In the present actions, Defendants present these same issues for decision. In *Omaha Property*, this Court concluded that as WYO companies, Defendants are required to pay municipal business license taxes in exchange for the privilege of doing business within municipal boundaries of this state like all other insurance companies conducting such business in this state must do. The Court finds that there are no distinguishing facts or intervening factors that require this Court to depart from the decision reached in *Omaha Property*. Moreover, the Court finds that Defendants present no reason, compelling or otherwise, for this Court to reverse its decision in *Omaha Property*.

16

As was the case in *Omaha Property*, the actions before the Court are actions to collect debts owed by each Defendant. Defendants characterize the debt owed by each Defendant as a "Municipal Premium Tax" that is "imposed upon flood insurance premiums." However, as more fully set forth below, the debt sought to be collected from Defendants is for a municipal business license tax—*i.e.*, "an excise tax on the owner for the privilege of doing business not a tax on the property itself" in the municipalities of the State of South Carolina. *Carter v. Linder*, 399 S.E.2d 423, 424-25 (S.C. 1990). Municipal business license taxes are not "imposed upon flood insurance premiums." Instead, the Court finds that municipal business license taxes are based upon or measured by the gross premiums received by each Defendant in the prior calendar year. Gross total premiums collected within the municipalities' boundaries are merely used as a measuring stick to determine the amount of business each insurance company transacts in the municipality each year.

I.      **MASC's Claims Are Not Pre-empted by Federal Law.**

Defendants contend that their flood insurance business is exempt from municipal business license taxes and that municipal business license taxes "target" federal dollars. This Court disagrees.

A.      **The law of Federal preemption: presumption against preemption.**

"A fundamental principle of the United States Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const. Art. VI. cl. 2). The Supreme Court has cautioned; however, that "despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of

preemption with the starting presumption that Congress does not intend to supplant state law." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). Accordingly, "the purpose of Congress is the ultimate touchstone" of any preemption analysis. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (citation omitted).

While the Constitution permits federal law to supplant state law, "[c]onsideration of the issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that is the clear and manifest purpose of Congress.'" *Cipollone*, 505 U.S. at 516 (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Additionally, in the interest of avoiding unintended encroachment on the authority of the states, a court interpreting a federal statute pertaining to a subject traditionally governed by state law should be reluctant to find preemption "[w]here 'the regulated conduct touched interests so deeply rooted in local feeling and responsibility . . . .'" *Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1413 (4th Cir. 1994) (*quoting San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244 (1959)).

Federal law may preempt state law in three ways. First, Congress can preempt state law by enacting an "express provision for preemption" in any congressional act ("express preemption"). *Crosby*, 530 U.S. at 372. Second, Congress can implicitly preempt state law if a "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for states to supplement it" ("field preemption"). *Cipollone*, 505 U.S. at 516 (internal quotation marks and citations omitted). Field preemption occurs if the federal regulation of a field is pervasive, or if, "under the

circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting federal law." *Crosby*, 530 U.S. at 373 (alterations in original) (quotation and citation omitted). Third, even if Congress has not intended to occupy a particular field, "state law is naturally preempted to the extent of any conflict with a federal statute" ("conflict preemption"). *Id*. at 372 (citing *Hines v. Davidowitz*, 312 U.S. 52, 66-67 (1941)). Conflict preemption arises when it is impossible for a private party to comply with both state and federal law. *Crosby* at 372 (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)).

Because insurance law "is an area traditionally regulated by the states," Defendants "'bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law.'" *Bleecker v. Standard Fire Ins. Co.*, 130 F. Supp. 2d 726, 734 (E.D.N.C. 2000) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995)). The Court concludes that Defendants have not met their burden and that there is no federal preemption of the issues raised by MASC in its complaints.

### B.      The NFIA does not contain an express preemption provision.

"Preemption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-9 (1990) (internal citation omitted). The Court concludes that there is no evidence that the federal government expressly preempted state involvement in national flood insurance. *Spence v. Omaha Indem. Ins. Co.*, 996 F.2d

793, 796, n.20 (5th Cir. 1993) ("The NFIA contains no express preemption provision.") Moreover, the Court concludes that no provision of Defendants' contracts with FEMA prevent municipalities from assessing, and MASC from collecting, municipal business license taxes measured by the gross premiums received by Defendants in a given year.

Article III, section A of the current Arrangement between FEMA and Defendants provides that WYO companies are responsible for paying state premium taxes, but are excluded from paying certain other taxes:

> The Company shall be liable for operating administrative and production expenses *including any State premium taxes*, dividends, agents' commissions or any other expense of whatever nature incurred by the Company in the performance of its obligations under this Arrangement *but excluding other taxes or fees such as surcharges on flood insurance premiums* and guaranty fund assessments.

(44 C.F.R. § 62, App. A, Art. III (A)); Financial Assistance/Subsidy Arrangement, Appendix A—Part 62, Article III, section A (emphasis added.)  Additionally, section B of the Arrangement provides that WYO companies are entitled to withhold certain operating and administrative expenses, "including agents' or brokers' commissions, an amount from the Company's written premiums on the policies covered by [the] Arrangement in reimbursement of all of the Company's marketing, operating and administrative expenses . . . ." Appendix A—Part 62, Article III, section B.

Absent an express preemption provision, the question is whether the NFIA's regulations are so comprehensive in the field as to leave no room within which the states may act, or whether the provisions of the Act actually conflict with causes of action based on state law.

20

### C.     <u>Congress has not preempted the field.</u>

"Where . . . the field which Congress is said to have pre-empted includes areas that have been traditionally occupied by the States, congressional intent to supersede state laws must be clear and manifest." *English*, 496 U.S. at 79 (internal citations and quotations omitted). Insurance law is an area traditionally regulated by the states, *Bleecker*, 130 F. Supp. 2d at 734, and most courts have declined to find field preemption in the flood insurance context. *See id.*; *Scherz v. South Carolina Ins. Co.*, 112 F. Supp. 2d 1000, 1006 (C.D. Cal. 2000); *Davis v. Travelers Prop. & Cas. Co.*, 96 F. Supp. 2d 995, 1002 (N.D. Cal. 2000); *Stanton v. State Farm Fire & Cas. Co., Inc.*, 78 F. Supp. 2d 1029, 1038 (D.S.D. 1999).[8] The Court concludes that by not raising the issue, Defendants concede this point.

### D.     <u>No conflict between state and federal law exists.</u>

Absent any evidence of either express or field preemption, the only other question is whether it is impossible for Defendants to comply with both state and federal law. *See Crosby* at 372 (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)). Conflict preemption includes both situations in which "it is impossible for a private party to comply with both state and federal requirements" ("direct conflict preemption"), and

---

[8] There are several indications that the federal government did not intend to preempt all state involvement in national flood insurance. For example, the WYO regulations require state licensing, *see* 44 C.F.R. § 59.1, and allow for state auditing and regulatory control. *See* 44 C.F.R. Pt. 62, App. B ("WYO Companies are subject to audit, examination, and regulatory controls."). Moreover, the state has a substantial interest in regulating the activities of insurers in its borders. Requiring insurers who offer flood insurance to abide by the same laws and regulations applicable to all other insurance companies in the state would not place a significant burden on insurance companies. *See Bleecker*, 130 F. Supp. 2d at 736; *see also Davis v. Travelers Property & Cas. Co.*, 96 F. Supp. 2d 995, 1003 (N.D. Cal. 2000) ("It is hard to believe that the NFIP will be compromised merely if states subject WYO carriers to their normal rules that apply to the came carriers in non-NFIP contexts. . . .").

situations in which state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" ("obstacle preemption"). *English*, 496 U.S. at 79 (internal citations and quotations omitted). "Conflict preemption is particularly difficult to show when "'the most that can be said about the state law is that the direction in which state law pushes [behavior] is in general tension with broad or abstract goals that may be attributable to . . . federal laws.'" *Fitzgerald v. Harris*, 549 F.3d 46, 53 (1st Cir. 2008) (quoting L. H. Tribe, *American Constitutional Law* § 6-26 at 487 (2d ed. 1998)). The Court concludes that nothing would prevent Defendants from complying with both state and federal law.

### 1.  Direct conflict preemption

Relying on 44 C.F.R. § 62, App. A, Art. II (G), Defendants contend that "it is plainly impossible for Defendants to comply with both the municipal ordinances imposing the [municipal business license tax] one the one hand . . . and the 2008 Memorandum directing Defendants not to pay the tax on the other" because "FEMA regulations require WYO Companies to strictly adhere to all written guidance and directives from the agency . . . ." The Court concludes, however, that the purpose of 44 C.F.R. § 62, however, is "[t]o assist the company in underwriting flood insurance using the Standard Flood Insurance Policy." In that endeavor—*i.e.*, underwriting flood insurance using the SFIP, WYO companies "shall comply with written standards, procedures, and guidance issued by FEMA . . . ." 44 C.F.R. § 62, App. A, Art. II (G). The Court concludes that the actions before this Court have nothing to do with underwriting flood insurance. Rather, these actions are about whether

Defendants, as WYO companies, must pay municipal business license taxes like every other insurer in the state must do.

Nothing prevents Defendants from complying with both state and federal law. Defendants can pay the municipal business license taxes with their own funds.  Indeed, it is clear that the Arrangement between FEMA and WYO companies contemplates that some costs, expenses and judgments incurred by WYO companies will not be covered under the Arrangement and are the responsibility of Defendants.  "Neither the NFIA nor FEMA's regulations mandate that FEMA reimburse insurers for payments on extra-contractual claims.  Indeed, FEMA regulations suggest that the Agency has no obligation to reimburse WYO insurers for such claims."  *Davis*, 96 F. Supp. 2d at 1004.  Thus, the Court concludes that the municipal business license tax and related penalties are extra-contractual claims imposed by the municipalities, not covered by the Arrangement, of which Defendants are solely responsible.

2.    **Obstacle preemption**

a.    <u>**Requiring Defendants to pay municipal business license taxes would not increase the cost of the NFIA.**</u>

Obstacle preemption applies "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  "This occurs where state law 'interferes with the *methods* by which the federal statute was designed to reach [its] goal.'"  *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824 (4th Cir. 2010) (emphasis in original) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992)).

23

Defendants contend, "WYO Companies' payment of the [municipal business license tax] would frustrate both the objectives of the NFIA and the methods FEMA has chosen to achieve them by substantially increasing the cost of the Program." This Court disagrees.

Under the Arrangement, Defendants "shall separate Federal flood insurance funds from all other Company accounts . . . for the collection, retention and disbursement of Federal funds relating to its obligation under this Arrangement *less the Company's expenses* as set forth in Article III . . . ." (Dkt. # 66-2, Art. II E (emphasis added).) In order to pay their operating, administrative, and production expenses, including any state premium taxes (Dkt. # 66-2, Art. III A), Defendants "may withhold, as operating and administrative expenses . . . an amount from the Company's written premium on the policies covered by this Arrangement in reimbursement of all of the Company's marketing, operating and administrative expenses . . . ." (Dkt. # 66-2, Art. III B.) Defendants' expense allowance "may increase a maximum of two (2) percentage points depending on the extent to which the company meets the marketing goals for the Arrangement year contained in marketing guidelines . . . ." (*Id*.)

The testimony establishes that selling flood insurance is a lucrative enterprise. The benefits of being a WYO company include offering Defendants the opportunity for additional revenue for the WYO company. The federal government sets the rates for insuring for flood through the NFIP. The rates "apply to all flood risks in the United States according to the flood zone." Thus, Defendants do not have control over these rates. Regardless of the number of WYO companies in South Carolina, a potential insured is going

24

to receive the same rate regardless of which WYO company offers the potential insured coverage.

The testimony further establishes that when a potential insured applies for flood insurance and writes a check to any one of the Defendants for the annual premium, that check is deposited into a restricted account, which is an account set up specifically for each WYO company. FEMA does not have access to these funds at this point. Indeed, when a claims adjuster settles a claim, he or she acts on behalf of the insurance company and does not have to seek approval from FEMA to make a payment on that claim from the restricted account. Instead, "this account is used not only to receive the premium income but also to pay claims expenses, administrative expenses, and agent commission expenses. And its only after it's—after the net balance of the account reaches 5,000 does it go to FEMA." Out of this account, claims are paid as needed, and expenses and commissions are paid monthly. Specifically, "the NFIP establishes a percentage of total premium that will be applied to expenses." That amount, roughly 28.9 percent of premiums collected by a particular WYO company—is not federal funds. Instead, "[t]hat part of the income is then distributed monthly to the Write-Your-Own company."

Defendants contend that *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824 (4th Cir. 2010) is dispositive. The Court disagrees. In *Columbia Venture*, FEMA hired an independent contractor (defendant) to provide engineering and related services to assist FEMA in its reassessment of flood evaluation maps of the Congaree River area in South Carolina. *Columbia Venture*, 604 F.3d at 827. Defendant designated a large portion of plaintiff's property as part of a floodway, thereby preventing plaintiff from developing

25

much of its property and significantly reducing the value of the property.  *Id*.  After an unsuccessful administrative appeal, plaintiff brought an action in South Carolina District Court against defendant alleging various state law tort causes of action.  *Id*.  The district court granted defendants' motion to dismiss plaintiff's complaint, holding that the NFIA preempts plaintiffs state law claims under a theory of obstacle preemption.  *Id*. at 828.

The Fourth Circuit affirmed the decision of the district court.  In so doing, the court noted that Congress established the NFIP "in response to recurring flood disasters that were 'placing an increasing burden on the Nation's resources.'"  *Id*. at 830 (quoting *Studio Frames Ltd. v. Std. Fire Ins. Co.*, 483 F.3d 239, 243 (4th Cir. 2007)).  The court affirmed the district court's conclusion that allowing state law causes of action against FEMA's independent contractors would undermine the purposes of the NFIA and increase the financial burden on the United States treasury.

The Court concludes that no such burden exists in this case.  As established above, Defendants can pay their municipal business license taxes from their own funds.  The required payment of municipal business license taxes as measured by the amount of gross premium receipts received by Defendants is not new.  The evidence establishes that since at least 1994 when MASC began administering the tax collection program for the cities, entities like Defendants have been responsible for paying—and indeed have paid—municipal business license taxes for the privilege of conducting business in South Carolina.  Since at least 2001, insurance companies have been paying business license taxes on flood policies.  In fact, South Carolina has had approximately forty insurance companies writing flood policies for the past ten years.  The number of companies in South Carolina

26

writing flood insurance policies has not varied greatly, thus requiring payment of municipal business license taxes has not altered their business decision to cease writing flood policies in South Carolina. In fact, just the opposite has occurred, companies have remained.

Defendants fail to point to any demonstrable evidence of any increase in the cost of the NFIP. Nor is there any evidence of insurers fleeing from the program. And by all accounts, it has been Defendants, not FEMA, that have borne the costs of those taxes over the last sixteen years.[9] Defendants' contention to the contrary is based on pure speculation and hyperbole and should therefore not be considered by this Court. *Columbia Venture* is inapposite.[10]

Thus, each Defendant makes money by having its expenses total less than the 29.8 percent distributed to them monthly. Each Defendant has the ability to make significant income on these policies as long as they keep their expenses down. Clearly, Defendants could pay their administrative expenses, including assessed municipal business license fees from the 29.8 percent or any general funds account. The Court concludes that Defendants are therefore incorrect in their suggestion that the "imposition of the [municipal business

---

[9] In fact, of the forty-plus companies writing flood policies in South Carolina, the Defendants and several other companies who have agreements with MASC are the only entities challenging municipal authority to impose the business license tax. The other companies pay the business license tax with no affect on the program's cost.

[10] For these same reasons, Defendants' reliance on *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 262 (3d Cir. 2004) and *Peal v. North Carolina Farm Bureau Mut. Ins. Co., Inc.*, 212 F. Supp. 2d 508 (E.D.N.C. 2002) is also misplaced. The required payment of municipal business license fees has never been reimbursed by FEMA, and to the extent it has been, FEMA has never complained of any increased burden on the treasury. If there is a "plain[] . . . right to reimbursement from FEMA," Defendants plainly have never exercised that right and have simply paid the amounts owed from monies designated for their operating and administrative expenses.

27

license tax] would . . . result in increased costs to the Program, which would have to be absorbed by . . . the federal treasury through reimbursement for taxes paid by the companies." The Court concludes that the federal treasury has nothing to do with these expenses and FEMA has no obligation to reimburse defendants for such claims. *Davis*, 96 F. Supp. 2d at 1004.

      **E.**      **FEMA's 2008 Memorandum does not preempt state law.**

As the above analysis conclusively demonstrates, there is no indication that Congress intended to exempt Defendants from paying municipal business license taxes when it enacted the NFIA. The remaining question is whether the 2008 Memorandum issued by FEMA serves to preempt the state law requiring Defendants to pay municipal business license taxes. The Court concludes that it does not.

In the May 23, 2008 FEMA Memorandum, David I. Maurstad, the Federal Insurance Administrator, states, "[B]ecause these policies are underwritten by the Federal government, the premiums collected as payment for coverage under these policies are Federal dollars and, as such, are not subject to State or local taxation." If these premiums were federal dollars, this Court might agree with this assessment. But as this Court has concluded above and in *Omaha Property*, municipal business license taxes do not tax the premiums collected by Defendants.

Moreover, even assuming that the Memorandum is relevant, or that FEMA could order private companies not to pay operating expenses, it does not have the force of law, and certainly does not serve to preempt state law. In directing WYO companies not to pay municipal business license taxes "in South Carolina or in any other jurisdiction where such

assessments are made," FEMA did not adopt a regulation. Instead, the Court concludes that the Memorandum is merely a FEMA administrator's erroneous interpretation of the law.

"Federal regulations have no less preemptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. Cuesta*, 458 U.S. 141, 153 (1982). Pursuant to 28 U.S.C. § 4128(a), FEMA's director "is authorized to issue such regulations as may be necessary to carry out the purpose of [the National Flood Insurance] Act." Congress has not expressly indicated whether WYO companies are responsible for paying municipal business license taxes. "When Congress has 'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (footnote omitted) (quoting *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 843-844 (1984)).

"This does not mean, however, that federal law capable of preempting state law is created every time someone acting on behalf of an agency makes a statement or takes an action within the agency's jurisdiction." *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 245 (3d Cir. 2008). Indeed, three things are necessary for a regulation to have the force and effect of law. First, they must "be 'substantive' or 'legislative-type' rules, as opposed to 'interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *United States v. Mitchell*, 39 F.3d 465, 470 (4th Cir. 1994) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301-02 (1970)). Second, "the regulation must have been promulgated pursuant to a congressional grant of quasi-legislative authority." *Mitchell*, 39

29

F.3d at 470. Third, "the regulation must have been promulgated in conformity with the congressionally-imposed procedural requirements such as the notice and comment provisions of the Administrative Procedure Act . . . ." *Id*. The Court finds and concludes that the 2008 Memorandum not meet the first or third of these requirements.

The United States Supreme Court has "recognized a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Mead Corp.*, 533 U.S. at 229. "It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Id*. at 230 (footnote omitted). Thus, with good reason courts generally "decline to afford preemptive effect to less formal measures lacking the 'fairness and deliberation' which would suggest that Congress intended the agency's action to be a binding and exclusive application of federal law." *Fellner*, 539 F.3d at 245. As the Third Circuit elucidated:

> Regularity of procedure—whether it be the rulemaking and adjudicatory procedures of the APA or others which Congress may provide for a particular purpose—not only ensures that state law will be preempted only by federal 'law,' as the Supremacy Clause provides, but also imposes a degree of accountability on decisions which will have the profound effect of displacing state laws, and affords some protection to the states that will have there laws displaced and to citizens who may hold rights or expectations under those laws.

*Id*.

Thus, the Court concludes that "[a]gency action that lacks the fairness of the 'formal, deliberative process' inherent in notice and comment rulemaking and agency adjudication, such as the issuance of a policy statement, guidance or letter, does not have the force of law to preempt a state law." *Mwantembe v. TD Bank, N.A.*, 669 F. Supp. 2d 545, 553 (E.D. Pa. 2009). *See also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *Fellner*, 539 F.3d at 250 ("[T]he FDA's Advisory and backgrounder are not agency interpretations of regulations claimed to preempt state law but rather are the very agency actions which are claimed to preempt state law."); *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 339-40 (3d Cir. 2009) ("[I]t is federal law which preempts contrary state law; nothing short of federal law can have that effect.")

The 2008 Memorandum is merely an interpretation of law by FEMA, and is neither relevant to the issue before this Court, nor is it a regulation resulting from a formal, deliberative process. Therefore, the Court concludes that the Memorandum does not preempt municipal business license taxation.

**F.    Conclusion**

For the reasons set forth above, the Court concludes that Defendants have failed to establish that their flood insurance business is exempt from municipal business license taxes. MASC has established that municipal business license taxes are not preempted by federal law. The Court, therefore, grants partial summary judgment in favor of MASC on

Defendants defense of federal preemption and denies summary judgment to Defendants on that defense.

## II.     Payment of Municipal Business License Taxes Does Not Violate Sovereign Immunity.

Defendants are arguably correct in their assertion that a municipal premium tax *as applied to federal flood premiums* violates the federal government's sovereign immunity from state or local taxation.  But this case involves neither "municipal premium taxes," nor "municipal premium taxes as applied to federal flood premiums."  The taxes at issue do not "target" federal funds.  They are taxes based on or measured by the amount of premiums received and are imposed as a cost of doing business in the State of South Carolina.[11]  But even if the municipal business license tax imposes a burden on the United States, the Court concludes that the burden is indirect at best, and thus does not violate sovereign immunity principles.

The United States Supreme Court has held that "a State cannot constitutionally levy a tax directly against the Government of the United States or its property without the consent of Congress."  *United States v. City of Detroit*, 355 U.S. 466, 469 (1958) (citing cases).  At the same time, however, "it is well settled that the Government's constitutional immunity

---

[11]    South Carolina appellate courts have approved the levying of taxes based on an assessment of gross insurance premiums collected in the state.  *See City of Charleston v. Gov't Employees Ins. Co.*, 512 S.E.2d 504, 506-507 (S.C. 1999) ("[T]he State has delegated this type of taxing authority to [municipalities] by enacting S.C. Code Ann. § 37-7-160 (Supp. 1997), which specifically permits municipalities to collect a business license fee or tax based upon insurance premiums collected in the municipality or realized from risks located therein."); *City of Columbia v. Putnam*, 127 S.E.2d 631, 633 (S.C. 1962) (noting that an ordinance setting the amount of license fees on a percentage of gross premiums is not invalid even when one class pays more than another).

does not shield private parties with whom it does business from state taxes imposed on them merely because part or all of the financial burden of the tax eventually falls on the Government." *Id*. (citing cases). In sum, "under the current intergovernmental tax immunity doctrine the States can never tax the United States directly but can tax private parties with whom it does business, even though the financial burden falls on the United States, as long as the tax does not discriminate against the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523 (1988) (citing cases). "A tax is considered to be directly on the Federal Government only 'when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *Id*. The Court concludes that neither circumstance is present in this case.

### A. The fact that WYO companies are "fiscal agents" of the government is of no moment.

According to Defendants, "the statutory designation of WYO Companies as 'fiscal agents' plainly contemplates a closer relationship between private industry and the federal government than the typical government contractor situation." This Court concludes, however, that even when a company is determined to be an agent or instrumentality of the government, that fact alone does not invalidate the tax:

> [The] exemption of Federal agencies from State taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of the power to serve the government as they were intended to serve it . . . .

33

*James v. Dravo Contracting Co.*, 302 U.S. 134, 161 (1937) (quoting *Union Pac. R.R. Co. v. Peniston*, 85 U.S. 5, 33 (1873)).

In *James*, the Supreme Court rejected the argument that a state tax on gross receipts under contracts between the company and federal government was a tax on the federal government. 302 U.S. at 161. The Court noted that this argument was premised upon the presumption that such a tax increases the cost of these contracts and is therefore a burden on the government. *Id.* at 159. The Court explained, however, that businesses contracting with the federal government, "taking into consideration . . . the competitive market for the service, may be willing to bear the tax and absorb it in his estimated profit rather than lose the contract." *Id.* Even when this is not the case and the tax increases the cost to the federal government, "that fact [does] not invalidate the tax." *Id.* In order for a tax to be invalidated it must be a "direct burden . . . laid upon the governmental instrumentality," not just "a remote . . . influence upon the exercise of the functions of government." *Columbia River Bridge Co. v. State*, 282 P.2d 283, 287 (Wash. 1955) (quoting *Fox Film Corp. v. Doyal*, 286 U.S. 123, 128 (1932)). *See also Neah Bay Fish Co. v. Krummel*, 101 P.2d 600, 604 (Wash. 1940) ("Even assum[ing] . . . appellants are instrumentalities of the federal government, we are unable to see how their duties or obligations to the government are in any way interfered with by the exaction of the challenged taxes"); *Yosemite Park & Curry Co. v. Johnson*, 76 P.2d 1191, 1191 (Cal. 1938) ("[the challenged tax does not] hinder the company in the efficient performance of its contract with the federal government").

The Court concludes that other than by sheer speculation, Defendants have failed to demonstrate how the payment of municipal business license taxes—something that has been

34

required and complied with in this state for at least ten years, is a direct burden on the United States. [12]

**B.    _Studio Frames_ is inapposite.**

Defendants' reliance on _Studio Frames Ltd. v. Standard Fire Insurance Co._, 483 F.3d 239 (4th Cir. 2007) is inaccurate.  _Studio Frames_ involved a claim made under a SFIP.  The issue was whether the claim made by the insured was payable under the terms of the SFIP. The case has nothing to do with extra-contractual demands, which are involved in the present case.

In _Studio Frames_, plaintiff, a small art gallery, was a lessee of store in a shopping center owned by Federal Realty Trust Investments ("Federal Realty").  483 F.3d at 241-42. In 1996, a hurricane caused flood damage to plaintiff's store and plaintiff, who did not have flood insurance, obtained a disaster relief loan from the Small Business Administration.  _Id_. at 242.  As a condition of the loan, plaintiff was required to buy flood insurance under the NFIP to cover the contents of the gallery.  _Id_.  Thus, plaintiff purchased a SFIP from defendant, a WYO insurer.  The policy listed $194,700 in building coverage and $287,200 in contents coverage.  _Id_.

Four years later, plaintiff again suffered severe flood damage, which it reported to defendant.  During an investigation of plaintiff's loss, the insurance company defendant learned that plaintiff did not own the building that housed the gallery.  _Id_.  Defendant also

---

[12]  As a result, it does not matter whether the Arrangement upon which this Court correctly based its decision in _Omaha Property_ and the NFIA conflicted in its designation of WYO companies as fiscal agents.  As further explained below, even if Defendants are fiscal agents of the federal government, it is Defendants, not the federal government, that are responsible for payment of business license taxes.

learned that in 1995, plaintiff's lessor, Federal Realty, obtained and continued to maintain a $500,000 federal insurance policy to cover the building that housed plaintiff's gallery. *Id*. Defendant informed plaintiff that because plaintiff did not own the building, plaintiff could not recover for losses to its leasehold improvements in the building, but that plaintiff could make a claim for leasehold improvement losses under the policy in an amount equal to ten percent of the contents coverage policy limit. *Id*.

Plaintiff eventually submitted a proof of loss to defendant and also reserved the right to file an additional proof of loss for damage to its leasehold improvements. *Id*. Defendant disagreed with plaintiff's assessment of its contents losses. *Id*. Eventually, plaintiff sued defendant in federal court seeking $132,597.05 under the building coverage portion of the policy. *Id*. at 242-243. The district court granted plaintiff's motion for summary judgment, holding that plaintiff was entitled to the $132,597.05 for damages to its leasehold improvements. *Id*. at 243. The court later denied plaintiff's motion for pre- and post-judgment interest, however. *Id*.

At issue on appeal was contractual and statutory coverage issues under the SFIP. In explaining the purpose and nature of the NFIP, the Fourth Circuit stated the following:

> FEMA, as authorized by statutes and regulations, arranges for property insurance companies in the private sector, called Write-Your-Own or WYO companies, to issue and administer federal policies in their own name. FEMA, in accordance with statutory parameters, establishes the terms and conditions of the standard policy (the SFIP), and the policy forms are codified as part of FEMA's regulations. WYO companies remit premiums collected, *after deducting a scheduled amount for administrative expenses*, to FEMA for deposit in the National Flood insurance Fund. *Claims are thus paid from federal funds*.

36

> *If a WYO company disallows a claim under an SFIP*, the statute allows the policyholder to sue FEMA in district court. FEMA regulations require the pertinent WYO company to defend the suit, and FEMA reimburses the company for defense costs. NFIP policy holders routinely sue the WYO company directly, and 'a suit against a WYO company is the functional equivalent of a suit against FEMA,' because a WYO company is a 'fiscal agent[] of the United States . . . . By the same token, a money judgment against a WYO company *for SFIP coverage* is a charge on the federal treasury.

*Id*. at 244 (emphasis added) (internal citations omitted).

In affirming the district court's denial of plaintiff's motion for interest, the Fourth Circuit once again noted that "a suit against a WYO company is essentially a suit against FEMA. Likewise, a money judgment against a WYO company is essentially a judgment against the government." *Id*. at 252. But the reason for this holding is that "an insured's *flood insurance claims* are ultimately paid by FEMA." *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 166 (3d Cir. 1998) (emphasis added). Thus, while "a WYO company collects premiums and disburses claims, only FEMA bears the risk under the flood insurance program." *Id*.

The actions before this Court have nothing to do with a flood insurance claim on a flood insurance policy. Rather, the actions before this Court involve Defendants' failure to pay assessed business license taxes imposed by 262 municipalities. MASC is not seeking repayment of premiums paid by insureds pursuant to the WYO program. Rather, MASC seeks payment of taxes assessed against Defendants in exchange for the privilege of conducting business within the municipalities of the state. Thus, Defendants' failure to pay

these assessed taxes involves conduct outside the scope of the WYO Program and the Arrangement between Defendants and FEMA.

In describing the relationship between FEMA and WYO insurers, the following regulation anticipates lawsuits against a WYO insurer for which FEMA will not be held liable:

> Limitation on Litigation Costs.
>
> a.  Following receipt of notice of such litigation, the FEMA Office of General Counsel ("OGC") shall review the information submitted.  *If the FEMA OGC finds that the litigation is grounded in actions by the Company that are significantly outside the scope of this Arrangement*, and/or involves issues of agent negligence, *then the FEMA OGC shall make a recommendation to the Administrator regarding whether all or part of the litigation is significantly outside the scope of the Arrangement.*
>
> b.    In the event the Administrator agrees with the determination of the FEMA OGC . . . then the Company will be notified in writing within thirty (30) days of the Administrator's decision that any award or judgment for damages and any costs to defend such litigation will  not be recognized . . . as a reimbursable loss cost, expense or expense reimbursement.

44 C.F.R. Pt. 62, App. A, art. III.D.3 (emphasis added).  The National Flood Insurance Program "only creates a cause of action when a claimant sues on the flood policy contract." *Bleeker*, 130 F. Supp. 2d at 737.  Because MASC is not seeking a refund of premiums paid under the Arrangement or the WYO program, this case plainly lies outside the Arrangement, and therefore any judgment awarded by this Court is the responsibility of Defendants, not FEMA.  Indeed, being a fiscal agent merely means that "[a]ny payment *on the policy* ultimately comes from the United States Treasury." *Dwyer v. Fid. Nat'l Property & Cas.*

*Ins. Co.*, 565 F.3d 284, 285 (5th Cir. 2009) (Emphasis added). This significantly diminishes Defendants' assertion of a possible "risk to federal funds" necessitating federal preemption.

In addition, 44 C.F.R. Pt. 62, App. A, art. XV states:

> Inasmuch as the Federal Government is a guarantor hereunder, the primary relationship between the Company and the Federal Government is one of a fiduciary nature, i.e., to assure that any taxpayer funds are accounted for and appropriately expended. The Company is a fiscal agent of the Federal Government, but is not a general agent of the Federal Government. The Company is solely responsible for its obligations to its insured under any policy issued pursuant hereto, such that the Federal Government is not a proper party to any lawsuit arising out of such policies.

Although these regulations do not explicitly provide for state law claims, they do contemplate insurer liability outside the arrangement between the Federal Government and a WYO company, and one would be hard pressed to conclude that those types of claims are preempted by federal law. Furthermore, under the regulations promulgated by FEMA, WYO companies are required to comply with state law. *See* 44 C.F.R. § 62.23(a) ("WYO companies may sell flood insurance coverage in any State in which the WYO company is authorized to engage in the business of property insurance."). Under South Carolina law, in order to qualify for an insurance license, an insurer must provide evidence that it "pays all taxes and performs all duties required by law." S.C. Code Ann. § 38-5-80(c) (Rev. 2002). Nothing under this provision exempts WYO companies from complying with the law applicable to every other insurer within the boundaries of the state.

Additionally, "WYO Companies are subject to audit, examination, and regulatory controls of the various states." 44 C.F.R. Pt. 62, App. B(b). Thus, the regulations contemplate that there will be certain expenses and costs that are exclusively the

responsibility of the WYO company, *not* FEMA.  This includes payment of business license taxes.  MASC's claim simply does not arise from the insurance policy.  Therefore, Defendants' contention that "a money judgment against a WYO Company is a charge in the federal treasury" is erroneous.  The Court in *Studio Frames* held, "By the same token, a money judgment against a WYO company *for SFIP coverage* is a charge on the federal treasury." *Studio Frames*, 483 F.3d at 244 (emphasis added) (citing *Gowland v. Aetna*, 143 F.3d 951, 955 (5th Cir. 1998)).  *Studio Frames* is therefore inapposite.

### C.     Conclusion

Because municipal business license taxes are not applied to federal flood premiums and do not target federal funds, Defendants' Motion for Summary Judgment on this defense is denied.

## III.     This Lawsuit Provides Defendants With All Process That is Due.

Finally, Defendants contend that "[t]o the extent such municipal ordinances, which purportedly provide for the imposition and collection of business license taxes, seek to do so without providing the Defendant taxpayers with notice, hearing, the right to contest the amount of taxes being collected, and the right of appeal, such ordinances violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment and Article I, Section 5 of the South Carolina Constitution and are unconstitutional."  (Dkt. # 67 at 5.)  The Court disagrees.

The South Carolina District Court rejected this very claim in *City of Charleston v. Hotels.com, LP*, 520 F. Supp. 2d 757 (D.S.C. 2007) observing that such a claim "severely

misunderstands the nature of due process protection." 520 F. Supp. 2d at 770.  As the Court

elucidated:

> Defendants are indeed entitled to notice and an opportunity
> to be heard, but the ordinary course of civil litigation under
> the Federal Rules of Civil Procedure provides ample
> protection of these rights.  Defendants received notice when
> they were validly served with the Complaints and subsequent
> pleadings.  Defendants are receiving an opportunity to be
> heard by being able to litigate the case in an impartial court
> of law. . . .  The fact that Defendants may be liable at the
> conclusion of litigation if a judgment is entered against them
> certainly does not constitute a violation of the Due Process
> Clause.  Indeed, if the Court were to accept Defendants'
> interpretation of due process rights, it would seem that every
> civil lawsuit for monetary damages would suddenly be
> transformed into a constitutional violation.

*Id*.

As further support for its contention that they have been deprived of due process,

Defendants rely on *BellSouth Telecommunications, Inc. v. City of Seneca*, C.A. No.: 8:98-

3451-13 (Apr. 28, 1999).  However, the Court finds that Defendants' reliance on *Bell South*

is misplaced.  In *Bell South*, the question was whether the district court, as a result of the Tax

Injunction Act, 28 U.S.C. § 1341§§,[13] lacked subject matter jurisdiction to entertain

plaintiff's suit to enjoin enforcement of an ordinance.  The issue was considered on

defendant's motion to dismiss.  In denying that motion, Judge Anderson noted that under

South Carolina law,

---

[13]    The Tax Injunction Act provides that "[t]he district courts shall not enjoin,
suspend, or restrain the assessment, levy or collection of any tax under state law where a
plain, speedy, and efficient remedy may be had in the courts of such state."  28 U.S.C. §
1341§.

> a *municipal license taxpayer* now has no statutory remedy,
> because the General Assembly repealed the pay under protest
> procedure of § 12-47-230.  Moreover, the state's procedural
> statutes specifically deny *the taxpayer* any other remedy.
> Section 12-60-80 provides that 'there is no remedy other than
> those provided in this chapter involving the illegal or
> wrongful collection of *taxes*.' . . . Furthermore, § 12-60-80
> provides that '[n]o action of the court . . . can stay or prevent'
> the *collection of taxes*.  S.C. Code Ann. § 12-60-80§§.  Thus,
> insofar as the Seneca Ordinance is concerned, a *municipal
> taxpayer* . . . is not provided with a remedy.

(Emphasis added).  Judge Anderson did not declare the ordinance at issue invalid, or that it

violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment and

Article I, § 5 of the State Constitution.  Further, Judge Anderson declined to dismiss the case

on the asserted ground that no adequate remedy existed under state law.   Instead, he

concluded that because South Carolina's case law and statutes do not provide a plain,

speedy, and efficient remedy in which to challenge an ordinance, "this Court must afford the

Plaintiff the opportunity to be heard."

Thus, Defendants can refuse to pay the tax or pay under protest.  Under these

circumstances, MASC must prosecute an action to collect them, and Defendants have every

procedural right to litigate in the federal courts.[14]  Defendants are therefore provided a clear

and certain predeprivation remedy including notice, an opportunity to be heard, and judicial

review.

---

[14] It is disingenuous for Defendant Service Insurance Company to assert due process concerns since Service has failed to pay the tax, thereby forcing MASC to bring this action against it.  Clearly, the due process rights of Service have not been violated.

42

**Conclusion**

Because this proceeding provides Defendants with all process they are entitled to,

Defendants' Motion for Summary Judgment on this defense is denied.


s/Matthew J. Perry, Jr.
**MATTHEW J. PERRY, JR.**
**SENIOR UNITED STATES DISTRICT JUDGE**


**Columbia, South Carolina**
**March 30, 2011**

43